UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE


UNITED STATES OF AMERICA,      )
                                        )
          Plaintiff,       )
                                          )
v.                                )     No. 3:06-CR-100
                                        )     (PHILLIPS/GUYTON)
MELVIN SKINNER,              )
SAMUEL SKINNER, and      )
FRANK LOGAN ASBURY,     )
                                        )
         Defendants.     )


## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. The matters presently before the Court are: Defendant Melvin Skinner's Motion to Suppress [Doc. 34][1] and Defendant Samuel Skinner's Motion to Suppress Statements [Doc. 48].[2]

These matters came before the Court for an evidentiary hearing on February 13-14 and March 29, 2007. David Jennings, United States Attorney, and Hugh Ward, Assistant United

---

[1]Ultimately, Samuel Skinner did not join in Melvin's Motion to Suppress. [Docs. 45, 52].

[2]No motions regarding Defendant Frank Logan Asbury are under consideration in this Report and Recommendation.

States Attorney, were present for the government.[3]  Attorneys Ralph Harwell and Tracy Smith were present representing Defendant Melvin Skinner, and Attorney Michael McGovern was present representing Defendant Samuel Skinner.[4]  Defendants Melvin Skinner and Samuel Skinner were also present.  All evidence was submitted during the February 13 and 14, 2007 hearings.  Arguments were heard on March 29, 2007.

Defendants Melvin Skinner and Samuel Skinner have been indicted [Doc. 54] on one count of knowingly, intentionally, and without authority, combining, conspiring, confederating, and agreeing with each other and other persons to commit violations of 21 U.S.C. Section 841(a)(1), that is, to distribute, and possess with intent to distribute, in excess of 1,000 kilograms of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance.  These charges arise out of the seizure of certain items, namely controlled substances, which were found in a recreational vehicle ("RV") parked at a truck stop in Texas on July 16, 2006.

Melvin Skinner has moved to suppress all physical evidence seized from the RV as a result of the alleged warrantless search of the RV.  [Doc. 34].  Additionally, Melvin Skinner moves to suppress all statements made subsequent to the alleged warrantless vehicular search.  Melvin Skinner argues that the government improperly obtained cell-site data with a pen register instead of procuring a warrant.  [Doc. 35].  This information provided the government with Melvin Skinner's locale, which ultimately resulted in the search of the RV and discovery of contraband.  In response, the government argues that Melvin Skinner's Fourth Amendment rights were not violated because:

---

[3]United States Attorney David Jennings was present only on February 13, 2007.

[4]Attorney Tracy Smith was present for Defendant Melvin Skinner on February 13 and March 29, 2007.  She was not present on February 14, 2007.

Melvin Skinner does not have standing to contest the cell-site data; Melvin Skinner was traveling on a public thoroughfare without the expectation of privacy in his location; a pen-register is an appropriate method to procure cell-site data; and/or the officers acted in good faith throughout the process. [Doc. 39].

Samuel Skinner has moved to suppress all statements he made following his arrest, alleging that his arrest was without probable cause. [Doc. 48]. In response, the government argues that probable cause existed to arrest Samuel Skinner upon contact at the truck stop in question. [Doc. 55]. Therefore, Samuel Skinner's statement are admissible as evidence obtained subsequent to a lawful arrest.

## I. FACTS

At the evidentiary hearing on these motions, Special Agent Lewis, Phillip Apodaca, Special Agent Westerman, Task Force Sargent Bearden, and Officer Pyeatt were called as government witnesses. The defendants did not call any witnesses.

### A. Special Agent Lewis

First, the government called Special Agent Dave Lewis ("Agent Lewis"), an agent with the Knoxville branch of the Drug Enforcement Administration ("DEA"). He testified that in January of 2006 a traffic stop in Flagstaff, Arizona, resulted in the arrest of an individual and the seizure of $362,000. The arrested individual was cooperative with law enforcement and ultimately began working with Agent Lewis and his co-worker, Special Agent Davis, as a confidential informant ("the CI"). The CI informed Agent Lewis that he worked with Mike West ("West") as a money courier in West's marijuana trafficking enterprise.

Agent Lewis then learned that West had two houses, one in Mooresburg, Tennessee and another in Candler, North Carolina. The CI identified Phillip Apodaca ("Apodaca") as West's supplier. Based upon this information, Agent Lewis prepared an affidavit to intercept wire communications from West's phone.

In face to face meetings with the CI, West referred to other phones, described by West as "super secret phones." When he was arrested, the CI had been carrying one of these super secret phones, a cell phone he had borrowed from another courier, Mark Cort ("Cort"). From the CI and the wire intercepts, Agent Lewis learned that West and his affiliates would periodically discard their cell phones and get new ones with different phone numbers. West had stated that all of the phones were subscribed to in fictitious names.

After obtaining the phone numbers, Agent Lewis attempted to verify the subscriber information. The phone West used was subscribed to "James Smith" and had a Tucson, Arizona address. The phone Apodaca used was subscribed to "Ben Crawford" and also had a Tucson address. Agent Lewis had the United States Postal Service inquire into the addresses provided for the super secret phones' subscribers and learned that the subscribers and addresses to West and Apodaca's super secret phones were fictitious. From face to face meetings, Agent Lewis also learned that Apodaca bought and supplied the phones.

The phones utilized by West and his colleagues were Virgin brand cell phones, which do not require any information to be verified. Any name, address, or zip code can be utilized to open a subscriber account. The user must only buy a phone and then a card to put minutes onto the phone. The phones and minutes can be purchased with cash or credit cards. Because these cards allow much anonymity, Agent Lewis testified that they are "virtually untraceable." [Doc. 71 - Tr.

30].[5]  Agent Lewis began listening to the communications on West's super secret phone on June 26, 2006.

Agent Lewis testified that he learned that West and his affiliates were involved in a large-scale marijuana trafficking operation.  As early as February, 2006, West talked about a "friend" named "Big Foot"[6] in face to face meetings with the CI.  West told the CI that Big Foot drove a Ford F250 pick-up truck with Georgia tags, and that he was one of his primary drug and money couriers.  During the Spring of 2006, Big Foot had delivered drugs for West on several occasions.  Agent Lewis testified that he did not know Big Foot's real identity until the day of his arrest.  Agent Lewis learned that Big Foot also had a super secret phone.  West would call Apodaca on one of his super secret phones and Big Foot on another.  West stated that he did not contact any one else on these phones, except that he did allow the CI to call on the phone line supposedly dedicated to Apodaca.

From a face to face meeting between the CI and West, Agent Lewis learned that a phone subscribed to "James Westwood" was used to facilitate drug trafficking.  Agent Lewis subpoenaed the phone company for a number in the name of James Westwood and learned that it was (520) 869-6447.  At the time he obtained the name and number of this phone, Agent Lewis believed Big Foot was carrying this phone.

Agent Lewis learned that Big Foot delivered money to Apodaca in June of 2006.

_____

[5]Though most of the references are to the hearing on February 13, 2007, and contained within Doc. 71, some testimony was taken on February 14, 2007, and contained with Doc. 72. For clarity, whenever the transcript is referenced, its respective document number is also referenced.

[6]As officers later learned, "Big Foot" is Melvin Skinner.  [Doc. 71- Tr. 28].

Over the super secret phone intercept, he also heard West and Apodaca discuss when Big Foot would be returning to Tucson, Arizona for a load of marijuana. Beginning around July 8, 2006, West and Apodaca planned for Big Foot to carry a shipment. They discussed that Big Foot, his son, and their wives had gone on vacation. They also discussed that Big Foot was going to deliver money to Apodaca before the vacation began, but there was no indication as to whether anyone else would join Big Foot on that venture.

Agent Lewis learned that Big Foot would be in Tucson beginning July 10, 2006, but that they would not begin loading the vehicle until July 11, 2007. The vehicle was to be loaded with over 900[7] pounds of marijuana. First, the marijuana would be loaded into a pick-up truck.[8] Then it would be transported to another, bigger vehicle. The second vehicle, the vehicle which would be used to transport the marijuana cross-country, was an RV. This RV was described as a nice vehicle with a diesel engine.

Over an intercept, Agent Lewis heard West tell Apodaca that Big Foot had his son with him and that the pick-up truck was having mechanical problems. West stated that the son had some mechanical expertise and that Big Foot and his son would fix the pick-up truck's problems themselves. Throughout the loading process, West and Apodaca stayed in close communication to apprise both Apodaca and Big Foot of the pick-up truck's location so that it could be loaded or unloaded accordingly. Through these conversations, Agent Lewis realized that Big Foot and his son were facilitating the transportation of marijuana. From a face to face meeting between the CI and

---

[7]Subsequent intercepts revealed that the amount was closer to 1000 pounds.

[8]There was never a specific reference to a Ford F250 pick-up truck; all references were to Big Foot and a pick-up truck.

West, the agents learned that Big Foot would be driving the RV and that the son would be driving the pick-up truck.

As of July 12, 2007, Agent Lewis still believed that Big Foot was carrying the phone registered to "James Westwood." Agent Lewis was given authorization to ping[9] the phone and ascertain its GPS location. He testified that he knew the phone had a GPS device installed in it based on the type of phones that allow minutes to be loaded onto them. Only a few models of telephones are available to those who opt not to subscribe to a wireless service but instead buy a phone which requires minutes to be loaded. After contacting the phone carrier, Agent Lewis learned the specifications for this phone and that it had GPS capabilities.

Once Agent Lewis pinged the phone, he discovered that it was in North Carolina. Agent Lewis testified that he immediately realized he had misunderstood previous intercepts of West's conversations. He now realized that the "James Westwood" phone was the phone that West used to call Big Foot, not the phone in Big Foot's possession used to call West. To ascertain the number of the phone being used by Big Foot, Agent Lewis called the phone company to get the toll records of all numbers dialed by the "James Westwood" phone. There were several calls, but all were to the help-line and to one other number, (520) 869-6820. The (520) 869-6820 number was registered to "Tim Johnson" and, based on the process of elimination, the agents knew it was the phone being used by Big Foot.

On July 13, 2007, Knoxville agents sought a new order, authorizing the agents to track the "Tim Johnson" phone. Though the actual affiant was Agent Davis, Agent Lewis testified

---

[9]"Pinging" a cell phone garners the GPS or triangulation information. [Doc. 71 - Tr. 74]. Technically, the phone company does the actual pinging, but the phone company will ping a phone at the government's ordered request. [Doc. 71 - Tr. 75].

they were working "hand in hand" throughout the investigation and application process. [Doc. 71 - Tr. 61]. Agent Lewis also testified that he always relies, and relied in this specific instance, on the Assistant United States Attorneys to provide the correct legal bases to support the applications and affidavits. The agents obtained the order sought.

Acting on the authority granted by the Court, the agents obtained GPS information from the phone company. From this information, the agents learned that the "Tim Johnson" phone was in Arizona. From a wire intercept, they learned that the last load of marijuana had been transferred to the RV on July 13. They also learned that Big Foot was not going to begin his cross-country journey until July 14. The agents believed that, once loaded, the caravan would transport the marijuana to Tennessee, but through a wire intercept they learned that Big Foot was actually going to take the marijuana to his home. Because the agents did not know the exact location of Big Foot's residence, and thus far did not know Big Foot's identity, they decided their best course of action was to locate the vehicle and apprehend it on its way east.

The agents did not have anyone following the vehicles and conducting visual surveillance. Therefore, the Knoxville agents watched where the phone was located via GPS tracking with the goal of ascertaining the location of the couriers, Big Foot and his son. They learned that the phone was traveling on an interstate, I-40, on July 15 and moving east across Texas. While watching the phone travel, the officers intercepted a phone call. Agent Lewis testified that at 10:30 P.M. there was a call between, he believed, West and Apodaca, "and Apodaca was wanting to know the progress of the load of marijuana and where it was. And West made the statement that, 'I just spoke to him and he told me that he's going to be driving for another couple of hours before he rests.'" [Doc. 71 - Tr. 50]. At that point, the agents realized the courier would be stationary soon

8

and began to narrow their focus to which Texas office they needed to work with to apprehend the courier. The agents determined that the Lubbock, Texas DEA office would be the closest to where the RV was likely to stop for the night.

At around 2 A.M., the Knoxville agents noticed that an identical GPS reading was appearing. They realized that what West had said earlier was coming true; Big Foot was taking a rest for at least some period of time. Using the latitude and longitude data provided from the telephone company, the agents determined that the vehicle was located at a truck stop near Abilene, Texas.[10] Between 2 and 3 A.M., Knoxville agents began contacting the Lubbock DEA office. The Lubbock supervisor began getting agents prepped and on the road towards the truck stop. From 2:00 A.M. until 7:40 A.M.[11] on July 16, 2007, the Knoxville agents periodically verified the phone's GPS location. It remained stationary.

Between 6:30 and 6:45 A.M., Agent Lewis testified that he talked to the Lubbock supervisor, who had Agent Westerman in the car with him. Agent Lewis:

> [d]escribed to him exactly what we knew to that point. And that there were two vehicles that were traveling together; one, a Ford F250 pick-up truck being driven by the son or the father; and a motor home being driven by the son or the father; and that the motor home would contain approximately one thousand pounds of marijuana.

[Doc. 71 - Tr. 53]. Additionally, the vehicles' license plates would be from Alabama or Georgia.

---

[10]The Court notes that, although Agent Lewis testified that the vehicle was at a truck stop near Abilene, Texas, nobody could have known that at this point. The only thing the Knoxville agents could have known from the GPS system was that a cell phone, believed to be in Big Foot's possession, was at a truck stop near Abilene.

[11]Note that the Knoxville agent testified in Eastern Standard Time, whereas the Texas agents utilized Central Standard Time. Hence, any seeming discrepancies in time are accounted for with the time differential between the zones.

Agent Lewis told the Lubbock agents about how the Knoxville agents had acquired their information: face to face meetings with a confidential informant, phone tracking, and wire intercepts. He further informed the Lubbock agents that he was confident both vehicles, the truck and the RV, were stationary and at the truck stop. Then, he testified that he said:

> Lewis: [O]nce they could make contact – once they identified these vehicles, that these people were to be arrested.
>
> Jennings: All right. Did you tell them – did you give them a description of the vehicles?
>
> Lewis: We gave them a description of the pick-up truck – Ford F250, yes.
>
> Jennings: Okay. Did you tell them anything about where you thought these vehicles might show registration from their license tags?
>
> Lewis: . . . I told them that it was going to be a southern state and that I believed it would be Georgia or Alabama.
>
> Jennings: Okay. Any other details that you told these agents as they were getting ready to go out and set up on this truck stop?
>
> Lewis: I told them that I knew that there was a motor home – I didn't know what type – but that it was going to be a large motor home, and that it should be – it's not going to be a rat trap, but it should be something that is fairly nice as motor homes go. And the same thing with the pick-up truck.

[Doc. 71 - Tr. 54-55].

Agent Lewis also testified that he continued to converse with the agents once they arrived at the truck stop. Agent Lewis described the target vehicles' expected appearance and noted that they would be traveling together.

The Lubbock agents relayed back what they saw in the truck stop's parking lot. They told Agent Lewis that they saw three RVs but only one had a pick-up truck in close proximity. Additionally, the other two RVs did not appear to have any vehicles accompanying them. The two

vehicles that were close together both had Georgia license plates. They further stated they intended to make contact with those two vehicles. As to the other vehicles in the parking lot, the Lubbock Agents told Agent Lewis that they had neither Georgia nor any other southeastern state's plates, but they did not fully describe those RVs to Agent Lewis. Agent Lewis testified that he instructed the Lubbock agents to take things slowly, make contact, request consent, and utilize a drug dog. He stated that he wanted to see if the defendants would cooperate.

Once the officers made contact and subsequently arrested both defendants, Agent Lewis learned that Big Foot's real name was Melvin Skinner. The "Tim Johnson" phone was seized from Melvin Skinner.[12] After contact was made with the truck, Agent Lewis learned that Melvin Skinner's son was Samuel Skinner,[13] and he was driving the pick-up truck. Agent Lewis testified that he had no prior information regarding a person named "Samuel Skinner," and that he had no knowledge of a telephone being given to him. However, he asserted that he knew facts which led him to believe that Samuel Skinner was involved in the marijuana trafficking:

> McGovern: At that point in time [the moment of arrest], you didn't have any facts that would lead you to conclude that Sam Skinner participated in any manner with the transfers of the load of marijuana in Tucson, did you?
>
> Lewis: Certainly, I did.
>
> McGovern: What evidence did you have?

---

[12]This phone was marked for identification only as Government Exhibit 8. [Doc. 71 - Tr. 156]. This phone is at the center of Melvin Skinner's motion to suppress. It had the following taped to it: Tim A. Johnson, 1197 S. Irvington, vkey 147741 85712. [Government's Exhibit 8 (for identification only); Doc. 59-2, Defendant's Exhibit 2 from January 3, 2007 hearing].

[13]Agent Lewis also learned, after the arrest, that Samuel Skinner was nicknamed "Little Foot" by some of the other couriers.

Lewis: Well, there were two vehicles driven to Arizona. And that would require two drivers for the F250 and the motor home. So certainly, once the information came over the phone that the son was there also and that he's going to help with the process, I certainly –

McGovern: Now, let me… [(ellipsis in original] You are generalizing against about these conversations.

. . . . . .

Lewis: No. Actually, my opinion is based on the phone intercepts coupled with direct statements, coupled with common sense and experience. You don't bring a person not involved in a drug deal to a drug deal, just like you don't take a person not involved in a bank robbery to a bank robbery.

[Doc. 71 - Tr. 101-102]. Additionally, Agent Lewis testified that although he did not see Melvin Skinner or Samuel Skinner load the marijuana into the motor home, he had no doubt that the son had assisted in loading it because of the large quantity. Agent Lewis also noted that he knew that the pair would be traveling in tandem from Arizona to home. Moreover, Agent Lewis had previously learned that Big Foot and his mechanically inclined son were going to fix the pick-up truck's mechanical problems.

While the Lubbock agents were questioning Melvin Skinner and Samuel Skinner, Agent Lewis and the Knoxville agents were making contact with West. They seized the "Jason T. Smith" and the "James A. Westwood" phones from West.[14] Later on, Apodaca was contacted. The "Ben J. Crawford" phone, Apodaca's super secret phone, was seized from his possession.

---

[14]One phone had the following taped to it: Jason T. Smith, 1702 W. 6th, vkey 25800852 85713. The other had the following taped to it: James A Westwood, 3000 E Wetmore, vkey 147741 85715. [Government's Exhibit 6].

**B.    Phillip Apodaca**

The second government witness was Phillip Apodaca.[15]  Apodaca testified that he supplied marijuana for West and other individuals.  He kept stash houses around Tucson.  He has known West for the last five years and estimated that he has supplied West with approximately 6,000 pounds of marijuana.  Apodaca communicated with West through cell phones.[16]

On direct examination, AUSA Ward inquired as to the mechanics of Apodaca's phone system:

> Ward:  What was the system?  Who bought the cell phones, and who developed the system for the cell phones?
>
> Apodaca:  I, myself, would buy numerous cell phones.  I would get phones every couple of months at least.  We'd use a phone for a couple of jobs.  And then I would end up throwing those away and getting other ones just to try to help so the phones wouldn't eventually be listened to, or whatnot.  I would get them at various stores; small convenience stores, Targets, Wal-marts, places like that.
>
> Ward:  How long would you typically keep a phone?
>
> Apodaca: I would say – originally, we had planned for a month.  But sometime it would be up to two or three months.
> . . . . .
> Ward:  And you obtained the phones?
>
> Apodaca:  I obtained the phones, yes.
>
> Ward:  How did you get them to Mr. West?
>
> Apodaca:  One time I tried to Fedex them and that didn't work out too good.  They ended up being searched.  So the next time – the next

---

[15]Apodaca has entered a guilty plea regarding marijuana trafficking and money laundering and is presently awaiting sentencing.

[16]The cell phone Apodaca used was his super secret phone which was entered earlier as Government's Exhibit 7.

> time the driver would come out delivering me money, I would –
> myself, or someone that I had working for me, would put the phones,
> ready to be used and already programmed with the numbers in them
> and the memory, and we would put them in the glove box. And as
> soon as they got to the destination, the gentleman in the truck would
> give a phone to Mike [West] and keep one for himself.

[Doc. 71 - Tr. 143-44]. Apodaca testified that he or his associate would buy the phones. As to whose name the phone was placed in:

> Ward: Would you get these phones in your real name?
>
> Apodaca: No. . . . [A]t the beginning, I would make up a name and
> make up an address when I would call an operator for Virgin Mobile
> – and just make up a name and make up an address. And they would
> in turn, you know, hook up the phone and give you a phone number.
> Later on, I just started picking out names out of the phone book and
> using these particular individual[']s names and addresses.

[Doc. 71 - Tr. 151-52]. To further clarify the phone system's mechanics, the Court asked the witness:

> The Court: Let me ask one question for clarification of what we've
> been calling – talking about these cell phones. And this may be
> common knowledge, but it's not something I'm clear on[.] You said
> with regard to these Virgin brand mobile cell phones that you can just
> call someone and give them a name and address that you make up,
> and that would activate your phone until the minutes ran out?
>
> Apodaca: Correct.

[Doc. 71 - Tr. 159]. Apodaca also testified that all of this information can be fabricated, because the phone companies do not verify subscriber information.

Looking at two cell phones[17] bearing the names "Jason T. Smith" and "James A. Westwood" on sheets of paper attached to the phone, Apodaca testified:

---

[17]These are the same cell phones which were earlier entered into evidence as Government's Exhibit 6.

> Ward:  Now, there were names and addresses on the back of these phones.  Do you know why that is?
>
> Apodaca:  Yes, again, we have to have names on the phones when we hooked them up through the operator.  And these would be the phones [sic] that we picked out for these particular phones.
>
> Ward:  When you say we, who do you mean by we?  You and your associates here?
>
> Apodaca:  There was a gentleman that would stay at the stash house.  And he had various jobs to do that I would ask of him.  And one of them would be to hookup the phones and provide names with special – they would say V keys.  So when you would top up, they would say to add more time on your phones, you needed this information.  That's why they're taped on the back, so nobody would forget.

[Doc. 71 - Tr. 152-53].  In short, Apodaca's associates put the names and addresses on the backs of the phones to identify them in the event more minutes were needed.  On cross-examination by Attorney Harwell, Apodaca testified, "each time that I gave my so-called worker money to get the phones, I would tell him to add twenty minutes – or twenty dollars, sorry, worth of minutes on the phones.  So that way they would be in working order as soon as the phones were left in the truck." [Doc. 71 - Tr. 165].  Apodaca went on to state that it would be possible for Big Foot, or anyone else, for that matter, to add minutes to the phone in their possession.

Apodaca testified that the "Jason T. Smith" and "James A. Westwood" phones were sent to West, as part of a marijuana shipment, via the Ford F250 bearing Georgia tags.  Apodaca testified that a third phone, bearing the name "Tim A. Johnson,"[18] was delivered to West, who, in turn, was to give it to Big Foot.  All three of these phones were delivered to West via the Ford F250.  Apodaca stated that West informed him that Big Foot had received the phone and was using it.

---

[18]This phone is the same phone which was marked for identification as Government's Exhibit 8.

As to the origins of the "Tim A. Johnson" phone, Apodaca testified that one of his associates purchased the phone, with Apodaca's money, and had it programmed. Like all of the phones which Apodaca ordered to be bought and programmed, this phone was programmed with a Tucson, Arizona area code. Upon questioning from Attorney Harwell, Apodaca explained the phone's subscriber information:

> Harwell: Now, the Tim A Johnson of 1197 South Irvington; do you know who that is?
>
> Apodaca: I do not know him.
>
> Harwell: Do you know if there is such an individual in the world?
>
> Apodaca: No, I do not. That was the whole purpose of that. It wasn't – it wasn't anyone that was actually using the phone or dealing with the phone. It was just either a made-up name or a name out of the phone book. But no, I do not know Mr. Johnson.

[Doc. 71 - Tr. 163].

Later, Apodaca, on cross examination by Attorney Harwell, testified on the intended use of the phones:

> Harwell: [W]ith regard to the Virgin brand phones purchased for you and handed over to whoever was driving the Ford truck, you didn't explain to him that this was - - that this phone was purely for illegal uses?
>
> Apodaca: No, I didn't get. . . [(ellipsis in original)] No. But I told Mike [West], 'Mike, this phone is specifically for you and your driver.' If that was kept, I don't know. But that was the intended purpose.

[Doc. 71 - Tr. 180]. Apodaca subsequently reiterated his testimony on the phones' intended usage upon the Court's examination:

16

> The Court:  Going back to these Virgin brand cell phones, all the phones that you've talked about today were phones that were purchased either by you or your associates with your money; is that correct?
>
> Apodaca:  That's correct, Your Honor.
>
> The Court: For the sole and limited purpose of accomplishing these drug transactions; is that right?
>
> Apodaca: Yes, sir.

[Doc. 71 - Tr. 179].  Apodaca also testified that he had no knowledge about whether the phones had GPS devices installed in them.

Beyond the cell phones, Apodaca testified that he knew West had two drivers: Big Foot and someone known by the moniker "Fever."  Apodaca later learned that Mark Cort was Fever.  Although he met Cort in person, Apodaca did not meet either Melvin or Samuel Skinner because, "[t]hey were the latest drivers that were working for us.  And I just thought it was better for my protection to not know them." [Doc. 71- Tr. 145].  Apodaca testified that he did not know Big Foot's real identity until his arrest, although, at some point, West had mentioned the name "Skinner" to him.[19]  Accordingly, Apodaca communicated only with West, and West communicated with Big Foot.  Moreover, Apodaca attempted to keep all communications with Big Foot separated from himself:

> Ward:  Now, you're communicating with Mike West.  And he tells you he's communicating with Big Foot.  Are these on the phones that you have provided?
>
> Apodaca:  From my understanding, these are the phones.  That was the sole purpose for the phones that I bought them for.  So that I have

---

[19]The record was unclear as to whether Apodaca realized that "Skinner" was "Big Foot" or if he thought "Skinner" might be the name of one of West's other couriers or accomplices. [Doc. 71 - Tr. 179].

one phone for me and Mike to communicate with. And then I would have two other phones for Mike and the driver, which would be Big Foot, in this time. So I didn't want to cross the lines, in other words. I wanted one phone for me and Mike, and another pair of phones for Mike and Big Foot.

[Doc. 71 - Tr. 151].

Instead of meeting either Melvin or Samuel Skinner, Apodaca interacted solely with

Big Foot's truck:

Apodaca: Well, Mike [West] would let me know that he [(Big Foot)] was on his way. And once he got in town, Mike would let me know. And he would – Mike would let me know where he was staying, which hotel, what part of Tucson in town. And I would end up going and picking up the truck myself. And if there was money to be picked up, I would pick up the money. And then from there, it would either be me picking up the truck, or someone that worked for me that would pick up the truck at that specific location, whether it be the hotel they were staying at, or the place we had agreed upon. And from there, the keys were either, to begin with, in the ashtray or under the seat – somewhere along those lines. And eventually, we ended up having an extra key made for the truck.

[Doc. 71 - Tr. 146]. Apodaca further testified that either he or one of his associates would retrieve

money from the truck and/or the associates would load the truck with marijuana. They used their

own key to enter the truck to obtain the money or load the drugs.

Apodaca then described the truck as a larger truck, a Ford 250, that was lifted and

had chrome rims. Additionally, it was darker in color and had Georgia plates. Apodaca testified

that Big Foot's truck was always the same vehicle, until the last load when two vehicles were

utilized. In the last transaction, the same truck was involved, but in this transaction it functioned

mostly as a cavity to ferry smaller quantities of marijuana to a larger vehicle, which would then

transport the marijuana across the United States. Apodaca testified that he believed an RV was the

other vehicle, but that he never saw the other vehicle. The RV was only described to him as a larger

RV with a diesel engine. Regarding this final transaction, Apodca testified that West had told him that Big Foot's son was traveling with him this time.

## C. Special Agent Westerman

The government's third witness, Special Agent Alan Westerman ("Agent Westerman") is employed by the DEA's Lubbock, Texas office. He testified that on the morning of July 16, 2006, his resident agent in charge contacted him and said:

> [T]hat he had been contacted by the agents in Knoxville that there were two individuals, a father and son, that were possibly going to be headed through Lubbock in the Texas area, that one of the individuals was driving an RV, a recreational vehicle; the other subject was driving a Ford F250 pick-up. They stated that in the RV that there was going to be approximately one thousand pounds of marijuana that was being transported at that time.

[Doc. 71 - Tr. 185]. The vehicles were traveling from Tucson and headed towards either Alabama or Georgia. Further, the resident agent in charge told Agent Westerman that the Knoxville agents stated they had garnered this information through wire intercepts. Agent Westerman testified that he was told the Knoxville agents had utilized a GPS system to track the RV to a truck stop in Tye, Texas.[20] Agent Westerman was instructed to go to the truck stop and investigate.

On arrival, he saw three RVs and a Ford F250 pick-up truck in the parking lot. What was later determined to be the target RV was closest to the truck stop's store. The other two RVs were four or five parking spaces away from the store and closer to the road. The two RVs closer to the road did not appear to have any accompanying vehicles with them. The RV closest to the store, however, had a pick-up truck parked close to it. Agent Westerman testified that "the Ford 250 was sitting directly in front of the RV, approximately twenty to thirty feet gap between the front end and

---

[20]See supra note 10.

the back end of the pick-up. The pick-up was parked in the same direction directly in front of the RV." [Doc. 71 - Tr. 189-90]. The RV closest to the store and the pick-up truck both had their engines running whereas the other RVs did not.

The Knoxville agents had advised that the plates would be from either Alabama or Georgia. While conducting surveillance, Agent Westerman learned that both the RV and the pick-up truck's license plates were from Georgia. Agent Westerman could not recall which states' tags the other two RVs had, but he did know that Georgia tags were "the best – that was the RV that we were looking for." [Doc. 71 - Tr. 215]. Agent Westerman testified that he told the Knoxville agents about the plates, and the Knoxville agents informed him that those were the vehicles, based on all the information obtained throughout their investigation.

Agent Westerman testified that, although the officers believed they had sufficient probable cause to effectuate an arrest at this point, they decided to take their time and continue their surveillance. The officers "[s]at there a little over an hour just surveilling the area to see what we could see." [Doc. 71 - Tr. 191]. Agent Westerman saw an elderly couple exit an RV, go into the store, and return to the RV. He saw another RV leave the parking lot. Neither of these two RVs matched the RV and/or occupant descriptions that Agent Westerman had been given.

At this point, the officers concluded their surveillance and approached the truck and the RV simultaneously. Agent Westerman approached the RV. When the officers knocked on the RV's door, a man, later identified as Melvin Skinner, opened the door. Agent Westerman asked him where he was coming from. Melvin Skinner hesitated, but stated that he was coming from Las Vegas and headed towards Alabama. When asked whether anyone was traveling with him, Melvin Skinner stated that no one was. Then, Agent Westerman asked Melvin Skinner who was in the

truck:

> Jennings:  And what truck were you referring to?
>
> Westerman:  I was referring to the 250.  And that's what he said.  He said, "What truck?" And I pointed in the direction of the vehicle.  And at that time, the other officers were talking with the other subject that was in that vehicle as well.
>
> . . . . .
>
> Westerman:  After I pointed to the truck I was referring to, he lowered his head and he said, "That's my son."

[Doc. 71 - Tr. 195-96].

The officers asked Melvin Skinner for consent to search the RV, but Melvin Skinner did not give it.  Officer Pyeatt, a K-9 officer, performed a "free air sniff" with his dog.  Agent Westerman testified that Office Pyeatt informed him that the dog indicated the presence of narcotics within the RV.  When the officers entered the RV, they saw bundles of marijuana in plain view and found two cell phones and a charger on the passenger side of the RV.  Agent Westerman testified that Melvin Skinner was arrested at this point.  On cross examination, Agent Westerman testified that Melvin Skinner was not free to leave from the time that officers approached the RV and knocked on the door.  Agent Westerman went on to testify that Melvin Skinner was under arrest from the moment of approach and was already under arrest when the "free air sniff" occurred.

**D.    Task Force Sargent Bearden**

The fourth government witness was Task Force Sargent Steven Bearden ("Officer Bearden)".  Officer Bearden is an employee with the Lubbock Police Department, a division of the City of Lubbock.  He was assigned to the DEA and testified that he was present for the events occurring on July 16, 2007.  Officer Bearden testified that he was instructed to look for an RV and

a truck bearing southern state tags at the Flying J Truck Stop in Tye, Texas. The truck was described as a Ford, three quarter ton, and dark in color.

At the truck stop, Officer Bearden testified that he and other officers drove through the parking lot and looked at license plates. Though three other RVs were in the parking lot on arrival, the only southern state tags were on two vehicles, which were parked about thirty feet apart. Officer Bearden believed one RV had tags from out west, but he was certain that it did not have southern tags. During surveillance, the officers learned that one of the other three RVs contained an elderly couple, aged sixty-five to eighty. They got out of their vehicle, and the woman went into the truck stop. Because they had been told to look for a father/son pair, the officers discounted the elderly couple and their RV as a possible target vehicle. The two vehicles which had southern tags were running, although their occupants were not immediately visible.

Officer Bearden further testified that the plan was to approach the vehicles after the K-9 officer arrived, and then to arrest the occupants. Officer Bearden was assigned to the truck. He approached it and found an individual asleep in the truck's back seat. Officer Bearden knocked on the window, waking the individual. He instructed the individual to get his hands up. The individual did not immediately respond and Officer Bearden prepared to break out the window. At that point, the individual appeared to realize what was occurring and unlocked the truck. Officer Bearden testified that as soon as the individual unlocked the truck, he was pulled out of the truck, handcuffed, and placed on the ground. On cross examination by Attorney McGovern, Officer Bearden testified that when the occupant of the truck was pulled from the truck, the individual was not free to go. Attorney McGovern further asked, "no question that he was under arrest at that point

in time?" To which Officer Bearden replied, "yes." McGovern then queried, "he was cuffed immediately?" And Officer Bearden responded, "yes." [Doc. 71 - Tr. 235].

While the individual taken from the truck was on the ground, Officer Bearden looked towards the RV to make sure that the situation was stable. He saw the man in the RV and thought that the man in the RV and the man in the truck could potentially be father and son, at least based upon their respective ages.

At this point, Officer Bearden asked the individual his name and learned that he was Samuel Skinner.[21] Another officer, Agent Walker, read Samuel Skinner his rights. Samuel Skinner told the officers that he was traveling from Arizona to Georgia. He admitted that his father was the man in the RV. He further stated that he did not know what was in the RV, because he does not get into the RV. Officer Bearden told Samuel Skinner that officers had observed Samuel Skinner in the RV last night,[22] and Samuel Skinner responded, "yeah, I was in the RV, but I don't want to say anything else." [Doc. 71 - Tr. 233]. Officer Bearden testified that he ceased communicating with Samuel Skinner at this point.

E.    **Officer Pyeatt**

Officer Kevin Pyeatt ("Officer Pyeatt"), a police officer with the Abilene, Texas police department, was the final government witness. He is a K-9 officer. King is the K-9. King is trained to detect bodies and narcotics. King and Officer Pyeatt were asked to assist on July 16. Officer Pyeatt directed King to perform a "free air sniff" around both the subject RV and the subject truck. Officer Pyeatt testified that King alerted to the RV but not to the truck. Officer Pyeatt

---

[21]Agent Westerman also testified that Samuel Skinner was the man in the truck.

[22]This was a ruse. Officers had not observed Samuel Skinner in the RV.

informed the Lubbock DEA agents that King had alerted to the RV. At that point, Officer Pyeatt testified that the DEA agents proceeded to enter the RV.

## II. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Citizens also have the right to remain silent and the right to counsel under the Fifth and Sixth Amendments. Melvin Skinner contends that: (1) the government improperly obtained cell-site data without a warrant; (2) cell-site, global positioning system ("GPS") and ping data are not electronic communications, therefore they are excepted from disclosure under the Stored Communications Act; (3) no good faith exception applies; and (4) all evidence seized and subsequent statements should be suppressed as the fruits of an illegal search. [Doc. 35]. Melvin Skinner later[23] filed a supplemental memorandum asserting that the Stored Communications Act does not explicitly allow for a cellular phone to be used as a tracking device.[24] [Doc. 61]. Samuel Skinner contends that his arrest was warrantless and lacked probable cause, therefore all statements made subsequent to his arrest should be suppressed as fruits of an illegal arrest. [Doc. 49]. The Court will address each of these issues in turn.

---

[23]When Melvin Skinner filed his original motion to suppress, all parties understood a certain cell phone and corresponding pen register and affidavit in support thereof was at issue. At a later proceeding, the Court and all parties learned that another cell phone, with a different pen register and affidavit in support thereof, was the one at issue. [See Doc. 59].

[24]Much was made of the "hybrid theory," where the Stored Communications Act is interpreted in accordance with the Pen Register Act, at the hearing and in Melvin Skinner's memoranda in support of his motion for suppression. However, with the supplemental motion, Defendant stated that the "hybrid theory" is no longer applicable as the actual pen register and affidavit at issue were made solely in reference to the Stored Communications Act. [See Docs. 35, 56, 61].

## A.    Melvin Skinner

Melvin Skinner contends that: (1) the government improperly obtained cell-site data without a warrant; (2) cell-site, GPS and ping data are not electronic communications, therefore they are excepted from disclosure under the Stored Communications Act; (3) no good faith exception applies; and (4) all evidence seized and subsequent statements should be suppressed as the fruits of an illegal search.  [Doc. 35, 61].  In response, the government argues that Melvin Skinner's Fourth Amendment rights were not violated because he does not have an expectation of privacy which society is prepared to recognize as legitimate.  [Docs. 39, 44, 63]  In support thereof, the government states that Defendant was not the owner or subscriber of the phone, the phone was purchased and used exclusively for the sole purpose of drug trafficking, Defendant was traveling on public thoroughfares, and the officers acted in good faith in obtaining and executing the order.  [Id.].

### 1.    Cell Site Data

As a preliminary matter, the Court will explain its understanding of what "cell site data" is.  Cell-site data is "[s]impy data sent from a cellular phone tower to the cellular provider's computers."  United States v. Forest, 355 F.3d 942, 949 (2004).  Cell phones transmit radio signals to cell towers or cell sites when they are turned on; the radio signal data is cell site data.  United States v. Amaral-Estrada, 2006 WL 3197181, at *6 (S.D. Ind. June 30, 2006) (relying on In re Application for Pen Register and Trap/Trace Device with Cell Site Location Authority, 396 F. Supp. 2d 747, 751 (S.D. Tex. 2005)).  These radio signals do not carry the human voice.  Id.  However, the data can be utilized to ascertain the location of a cell phone and the user's physical location if the user possesses the phone and the phone is turned on.  In re Application fo U.S. for an Order Authorizing the Release of Prospective Cell Site Information, 407 F. Supp. 2d 132 (D.D.C. 2005)

(citing <u>In re Application for Pen Register and Trap/Device with Cell Site Location Authority</u>, 396 F. Supp. 2d 747 (S.D.Tx. 2005)).

Newer phones often come equipped with GPS receivers, which allow for more finely tuned tracking of the phone's location.[25] Melody Joy Kramer, *Somebody's Watching You – and It's Your Cell Phone,* www.npr.org/templates/story/story.php?storyId=6097216 (last visited Apr. 6, 2007). Pinging a cell phone to obtain its GPS data or utilizing the cell site data only conveys the location of the phone, not necessarily that of a specific person. <u>Amaral-Estrada</u>, 2006 WL 3197181, at *13.

2.      <u>Search</u>

The most basic issue in challenging a search on Fourth Amendment grounds is whether a search has actually occurred. The Court searched the parties' briefs and current case law to find a precedential case regarding whether utilizing cell site data or GPS information constitutes a Fourth Amendment search. The Court finds other court's treatment of beepers, which emit tracking signals, to be largely analogous.

A beeper, unlike a bug or wiretap, does not transmit conversation. <u>United States v. Cassity</u>, 604 F. Supp. 1566, 1572 (E.D. Mich. 1985). It does, however, permit authorities to monitor the beeper's location. <u>Id</u>. Therefore neither a search nor a seizure, as contemplated by the Fourth Amendment, occurs when a beeper is monitored. <u>United States v. Knotts</u>, 460 U.S. 276, 285 (1983); <u>see</u> <u>also</u> <u>Cassity</u>, 604 F. Supp. at 1572 (holding that beeper monitoring arguably falls outside the scope of the Fourth Amendment). Because of this minimally intrusive nature, several courts have

---

[25]It has been reported that approximately 100 million people have a GPS receiver built into their cell phone . Daniel Charles, *GPS is Smartening Up Your Cell Phone*, www.npr.org/templates/story/story. hp?storyId=6097216 (last visited Apr. 6, 2007).

held that using a beeper does not involve a search or seizure within the Fourth Amendment. <u>Cassity</u>, 604 F. Supp. at 1573 (citations omitted); <u>see</u> <u>United States v. Stephenson</u>, 490 F. Supp. 619, 622 (E.D. Mich. 1979) (holding that using a beeper's signals to follow an airplane or an automobile does not constitute a Fourth Amendment search and noting that both the Eighth and Ninth Circuits have adopted this approach).

Though the Court finds other courts' holdings on beepers to be analogous and persuasive, neither party argued or briefed the issue of whether a search actually occurred. Therefore, the Court will treat the issue as waived by the parties and assume that a search did, in fact, occur.

3.    <u>Standing</u>

It is elementary Fourth Amendment law that the Fourth Amendment does not guarantee against all searches and seizures; it only guarantees against unreasonable searches and seizures. <u>United States v. Sharp</u>, 470 U.S. 675, 682 (1985). Additionally, Fourth Amendment rights are personal rights which cannot be vicariously asserted. <u>Minnesota v. Carter</u>, 525 U.S. 83, 88 (1998); <u>United States v. Williams</u>, 353 F.3d 497, 511 (6th Cir. 2003). Because the Fourth Amendment guarantees only against unreasonable searches and seizures and these rights are personal, the defendant bears the burden of proving that his own Fourth Amendment rights were violated, and that he has "standing," to assert a Fourth Amendment violation. <u>United States v. Salvucci</u>, 448 U.S. 83, 86 (1980); <u>Rakas v. Illinois</u>, 439 U.S. 128, 132 (1978).

Technically, the concept of having standing, based on the item seized, has been discarded. <u>Salvucci</u>, 448 U.S. at 88 n. 4. The current standard is simply "[w]hether the defendant's rights were violated by the allegedly illegal search or seizure." <u>Id</u>. However, the term "standing"

is still used as "[s]horthand for the existence of a privacy or possessory interest sufficient to assert a Fourth Amendment claim." United States v. Daniel, 982 F.2d 146, 149 n.2 (5th Cir. 1993) (per curiam). Mere possession of a good does not equate to a Fourth Amendment privacy interest in the seized good. Salvucci, 448 U.S. at 91-92.

In this case, Melvin Skinner argues that the government violated his Fourth Amendment rights by using the cell phone's GPS capabilities to ascertain his physical location.[26] The government asserts that Melvin Skinner did not have standing in the phone, because he neither purchased the phone nor was the listed subscriber. Additionally, the phone was purchased and provided by Apodaca solely for effectuating drug trafficking.

Defendant relies on a recent Fifth Circuit case to substantiate standing in the cell phone. United States v. Finley, 477 F.3d 250 (5th Cir. 2007). In Finley, the Court found that a defendant had standing to challenge the search of his cell phone, even though the phone belonged to his employer and, while issued for work purposes, the defendant was permitted to use the phone for personal purposes as well. Id. at 254. The current case, is, however, easily distinguishable on the facts. In Finley a phone was provided for legitimate business purposes by a legitimate employer. The employer also allowed or contemplated personal calls. In the instant case, the phone was provided by a drug supplier solely for drug trafficking purposes. Accordingly, this Court finds that Finley is inapplicable.

To say that case law is substantially undeveloped as to what rights are accorded a cell phone's user, particularly in these circumstances, would be an understatement. This case is, at the

---

[26]The government stipulated to the fact that the Lubbock DEA agents would not have been at the truck stop but for the Knoxville DEA agents calling them regarding GPS information obtained from the "Tim Johnson" phone. [Doc. 71 - Tr. 219].

least, a novel issue within this Court. Of key import, the phone Melvin Skinner used was not subscribed to his name. When a defendant uses a fictitious name as part of his criminal scheme, whether the defendant has "standing" to assert a Fourth Amendment violation is questionable. Daniel, 982 F.2d at 149; see also United States v. Encarnacion-Montero, 2006 WL 2571404, at *17 (D. P.R. Sept. 5, 2006) (in dicta, noting that where a cellular phone was not registered in the defendant's name, the defendant lacked standing to raise the matter of suppression). "Standing" is questionable because a third person's cell phone's signal does not implicate a Fourth Amendment interest. Amaral-Estrada, 2006 WL 3197181, at *13.

Based on the thrust of Fourth Amendment precedent and the facts of this case, this Court finds that Melvin Skinner lacks standing to assert a Fourth Amendment protected interest in the cell phone. Accordingly, his motion will be denied. Further reasons for denying Defendant's motion are explicated below.

4. Expectations of Privacy

To contest whether a search comports with the Fourth Amendment, the defendant must have "a reasonable expectation of privacy" in the location searched. Rakas v. Illinois, 439 U.S. 128, 143 (1978). "It is well-established that a defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched." United States v. Talley, 275 F.3d 560, 563 (6th Cir. 2001); see also United States v. Oliver, 657 F.2d 85, 87 (6th Cir. 1981) (holding that an individual must have a "reasonable expectation of privacy" in the area searched to challenge the search's validity). Whether the defendant enjoys a reasonable expectation of privacy does not turn solely upon the defendant's subjective belief but also depends upon (1) the defendant's interest in and control of the

place searched, (2) any measures the defendant took to ensure privacy, and (3) whether society recognizes the defendant's expectation as reasonable. United States v. Padin, 787 F.2d 1071, 1075-76 (6th Cir. 1986).

A two-pronged test exists to determine the reasonableness of an individual's expectation of privacy. Oliver, 657 F.2d at 87 (relying on Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). First, a person must exhibit an actual, subjective expectation of privacy in the area searched. Id. Second, the person's expectation of privacy must be one that society is prepared to recognize as reasonable and legitimate. Id.; United States v. Pollard, 215 F.3d 643, 647 (6th Cir. 2000). More recent case law has further refined the two-pronged approach so that, "[a] subjective expectation of privacy is reasonable if it: (1) is a privacy expectation normally shared by people in that setting, and (2) it falls within some tolerance level which represents the limits of what society can accept given its interest in law enforcement." Oliver, 657 F.2d at 87 (citations omitted).

A legitimate expectation of privacy means more than a subjective expectation of not being discovered. As explained by the Supreme Court:

> "a burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as legitimate. His presence . . . is wrongful, his expectation of privacy is not one which society is prepared to recognize as reasonable."

United States v. Jacobsen, 466 U.S. 109, 122 n.22 (1984) (quoting Katz, 389 U.S. at 361 (Harlan, J., concurring) (internal citations and quotations omitted)). Accordingly, a defendant must have a legitimate expectation of privacy to have "standing" to contest a search.

*a.       Cell Phone*

Generally, a defendant can claim little expectation of privacy in a cell phone that he utilizes in public. Encarnacion-Montero, 2006 WL 2571404, at *17 (in dicta, noting that no expectation of privacy can be claimed for cell phone calls which were monitored while the defendant was on public streets). As to cell phone signals, a cell phone can only be used to locate a person if the phone is within the person's possession and the user has turned the phone on. In re Application of the United States of America for an Order for Disclosure of Telecommunications Records and Authorizing the Use of a Pen Register and Trap and Trace, 405 F. Supp. 2d 435, 449-450 (S.D.N.Y. 2005). Moreover, these signals are knowingly exposed to a third-party, the cell phone company, when a party uses the phone. Amaral-Estrada, 2006 WL 3197181, at *13. This third party exposure diminishes an expectation of privacy. Therefore, if the cell phone's possessor intended to keep the phone's location private, the possessor could turn off the phone, which would disallow signal transmission. Id.

Further, a defendant who subscribes to a phone in a fictitious name has an even lesser expectation of privacy. See In re Application of the United States of America for an Order Authorizing the Installation and Use of a Pen Register with Caller Identification Device and Cell Site Location Authority on a Certain Cellular Telephone, 415 F. Supp. 2d 663, 664-666 (D.W.Va. 2006). At least one court has found that utilizing a fictitious name is analogous to abandoning the property since "[b]y withholding from society that he is the source, [the defendant] has effectively repudiated any connection or interest in the item vis-a-vis society. . . ." United States v. DiMaggio, 744 F. Supp. 43, 46 (N.D.N.Y. 1990). Another court has noted that only the actual subscriber of the cell phone is protected by telecommunication privacy statutes. In re Application of the United States

of America for an Order Authorizing the Installation and Use of a Pen Register with Caller Identification Device and Cell Site Location Authority on a Certain Cellular Telephone, 415 F. Supp. 2d 663, 664-666 (D.W.Va. 2006). Therefore, a mere possessor of the cell phone that is not the listed subscriber has no statutory right to privacy in the phone. Id.; see also Amaral-Estrada, 2006 WL 3197181, at *13 (holding that a defendant has no expectation of privacy in a cell phone that he neither possesses nor uses).

Subscribing to a phone in a fictitious name is similar to renting a hotel room or sending a package in a false name; therefore, cases regarding such scenarios are persuasive. Where a hotel room was procured under a false name and paid for with a fraudulent credit card, no legitimate expectation of privacy in the room existed. United States v. Diaz, No. 1998-42, 1998-43, 1998 WL 635849, at *21 (D.V.I. Sept. 10, 1998). Where both the sender and the addressee of a package utilized fictitious names to avoid public disclosure of their subjective expectation of privacy for purposes of violating the law, no legitimate expectation of privacy in the items searched existed. DiMaggio, 744 F. Supp. at 46. In another case, a court determined that where the defendant utilized fictitious names on a package containing contraband and it was sent through the mail, "from a societal perspective, [the defendant] opted to conceal any purported interest in the package and consciously avoided any public announcement that he had a subjective expectation of privacy in the package. Thus, [the defendant] effectively repudiated his connection to the package and lost the means to exclude others from intruding upon his interest." United States v. Wood, 6 F. Supp.2d 1213, 1224 (D. Kan. 1998) (citing DiMaggio, 744 F. Supp. at 46).

In the instant case, the cell phone was, at all times, utilized on public thoroughfares and in public parking areas.[27]  Additionally, Melvin Skinner was not a legitimate subscriber to the phone.  Not only was the phone subscribed to in a fictitious name, but Melvin Skinner did not even procure the phone and establish the fictitious name himself.  The phone was bought by a drug supplier and provided to Melvin Skinner as part and parcel of his drug trafficking enterprise.  The phone was intended to be used solely to further illegal drug trafficking activities.  All of these factors were known to the Knoxville agents prior to obtaining Melvin Skinner's GPS location.  Accordingly, Melvin Skinner does not have a legitimate expectation of privacy in the subject cell phone.

      *b.*     *Automobile*

In the present matter, the information obtained from the cell phone was used to locate a vehicle.  Courts have long held that there is a diminished expectation of privacy in a vehicle, because a vehicle travels public thoroughfares and is in plain view.  <u>Knotts</u>, 460 U.S. at 281; <u>Rakas</u>, 439 U.S. at 148 (noting that cars are treated differently than houses or apartments).  Melvin Skinner was in an RV, a vehicle.  For the better part of the day, he had been traveling on a public thoroughfare, I-40, through Texas, plainly visible to anyone else on the interstate.  <u>See generally</u> <u>Karo</u>, 468 U.S. at 715 (holding that a defendant's rights were violated by government usage of a beeper because it obtained information about items in a home which were <u>not</u> capable of visual verification).  Because "a person travelling [sic] in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another" Melvin Skinner

---

[27]Though Melvin Skinner's attorneys established through Agent Lewis that the truck stop was actually private property, this Court finds that a truck stop parking lot is a parking lot accessible by the public and has treated it as a public parking lot accordingly.

cannot have a legitimate expectation of privacy in his location on the highway or in a public parking lot.  Knotts, 460 U.S. at 281; see also Forest, 355 F.3d at 951 (holding that a citizen does not have a legitimate expectation of privacy in his movements along a public highway).  Accordingly, there can be privacy interest in maintaining the secrecy of those locations.

Moreover, as noted above, more latitude is permitted to police who are searching automobiles, rather than houses.  Salvucci, 448 U.S. at 99 (Kennedy, J., concurring).  Accordingly, if greater latitude is extended to a car, perhaps even greater latitude should be extended to a cell phone search, which can, without doubt, be exchanged or disposed of faster than an automobile.  See Id., at 101 (Kennedy, J., concurring) (noting that whether the expectation of privacy is one which society recognizes as reasonable involves a consideration of the place in which the individual claims an interest).   A cell phone is more mobile and more capable of secretion than an automobile. Therefore, under either theory, traveling on a public highway or using a phone that he has no privacy interest in, Melvin Skinner's rights have not been violated.

### c.    Society is Prepared to Recognize

To establish an expectation of privacy, an individual must exhibit an actual, subjective expectation of privacy and that the person's expectation of privacy is one that society is prepared to recognize as reasonable.  Oliver, 657 F.2d at 87 (relying on Katz, 389 U.S. at 361 (Harlan, J., concurring)).  Whether an expectation of privacy is one that society is prepared to recognize as reasonable is "critically different" from the mere expectation that certain facts will not come to the authorities' attention.  Jacobsen, 466 U.S. at 122.  Similarly, where police officers utilized a beeper to locate a vehicle, the Court found "we have never equated police officer efficiency with unconstitutionality, and we decline to do so now."  Knotts, 460 U.S. at 284.

Numerous courts have written about whether an expectation of privacy exists that society is prepared to recognize as reasonable. Recently, the Supreme Court ruled on whether a society-recognized expectation of privacy existed in the case of <u>Minnesota v. Carter</u>, 525 U.S. 83 (1998). In <u>Carter</u>, two defendants were in an apartment, leased by another individual, solely to package cocaine. <u>Id</u>. at 86. The Court held that defendants were there for what was essentially a business transaction. <u>Id</u>. at 90. Property used for commercial purposes has a lesser expectation of privacy than that utilized for residential purposes. <u>Id</u>. Because defendants were solely on the property for a business transaction and lacked any previous connection to the leaseholder, the Court held that any search which might have occurred did not violate the defendants' Fourth Amendment rights. <u>Id</u>., at 91.

In the instant case, agents knew the phone's origination – a drug supplier – and its use – to effectuate drug trafficking – before the phone's location was intercepted. Society is not likely to recognize as legitimate a privacy interest in a telephone, provided by a drug supplier, that is used primarily to effectuate drug trafficking. Moreover, Melvin Skinner masked his identity by utilizing a fictitious name. Society is not prepared to recognize an expectation of privacy as reasonable when the individual opts not to manifest his expectation of privacy in a manner recognized by society as appropriate, such as placing the phone in his actual name. <u>Wood</u>, 6 F. Supp.2d at 1224 n.4.

Although the Court does not reach its decision based on its own research into the wireless industry, the Court notes that society is increasingly willing to utilize cell phones as a tool to track people. First, they are "key tools" for search and rescue teams to locate people lost in remote areas. Marguerite Reardon, *Turning cell phones into lifelines*,

http://articles.techrepublic.com.com/2100-1035>11-6140794.html (last visited Apr. 6, 2007). Second, in an effort to increase phone location specificity, the wireless E911 program was created. Federal Communications Commission, *Enhanced 911 - Wireless Services*, http://www.fcc.gov/911/enhanced/ (last visited Apr. 18, 2007). It mandates that mobile operators implement location tracking to trace cell calls to towers and then, in Phase II, to a more precise location of between 50 and 300 meters. Id.

 Additionally, companies and private individuals are utilizing cell phone GPS systems for their own purposes. For example, companies are not obligated to reveal whether GPS devices are installed in phones given to employees. Melody Joy Kramer, *Somebody's Watching You – and It's Your Cell Phone,* www.npr.org/templates/story/story.php?storyId=6097216 (last visited Apr. 6, 2007). This information can be used to see whether a purportedly sick employee is at home resting, or only pretending to be sick and actually attending a baseball game. Id. Further, some cell phone companies have further extended cell phone tracking abilities to allow friends to view other friends' locations. Id. (noting that as of September 18, 2006, Sprint and Nextel customers were able to download third-party software which broadcast their location to their friends by the internet).

 If rescue operations, employers, and friends can all track the location of a person using the GPS capability in the cell phone, it is reasonable to allow law enforcement officers to do the same. Again, the Court does not base its decision on this information, but noted it because of its indication of society's expectations of privacy in GPS locations.

 5.   Good Faith

 Evidence obtained pursuant to a warrant should only be suppressed where exclusion furthers the purposes of the exclusionary rule. United States v. Leon, 468 U.S. 897, 918

(1984). When officers have acted pursuant to a warrant issued by a neutral and detached magistrate in good faith, suppression is an inappropriate remedy to a Fourth Amendment violation. Id. at 919. Assuming, arguendo, that a Fourth Amendment violation occurred in the instant case, the Court finds that the officers acted in good faith on an order issued by a neutral, detached magistrate.

Though the defense vehemently argues that the government misrepresented the then-current status of the case law surrounding wiretaps and cell site tracking, the Court is well-aware of the current state of the law. Accordingly, even if the Office of the United States Attorney misrepresented something, and the Court does not find that it did, such misrepresentation would be of no effect because the Court is fully aware of the law. The type of misconduct envisioned in Leon that bars applying the good faith rule did not occur in this case. Therefore, even if the search was found unconstitutional, the good faith exception would apply.

> 6.    Conclusion

Because this Court finds that Melvin Skinner lacks standing, as defined herein, to contest any violation of privacy interests as they relate to the cell phone bearing the name "Tim A. Johnson," this Court finds that Melvin Skinner's Fourth Amendment rights were not violated.

**B.  Samuel Skinner**

The police must have probable cause to believe that a person has committed or is presently committing a crime to make a lawful warrantless arrest. Beck v. Ohio, 379 U.S. 89, 91 (1964); United States v. Richardson, 949 F.2d 851, 858 (6th Cir. 1991) (citing United States v. Watson, 423 U.S. 411, 418 (1976)). Stated another way, "[a] warrantless arrest may be supported by the existence of probable cause of sufficient weight to support a belief that the individual detained committed a criminal offense." United States v. McNeal, 955 F.2d 1067, 1071 (6th Cir.

1992) (emphasis in original). Probable cause is a reasonable ground for belief which is supported by less than prima facie proof but more than a mere suspicion. United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990) (citing United States v. One 1984 Cadillac, 888 F.2d 1133, 1135 (6th Cir. 1989)). It exists "[i]f the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." Lovell v. Henderson, 386 F.2d 257, 259 (6th Cir. 1967) (citing Stacey v. Emery, 97 U.S. 642, 645 (1878)).

Whether an officer has probable cause to make a warrantless arrest is not judged based on solely that officer's knowledge of the events. United States v. Rose, 541 F.2d 750, 756 (8th Cir. 1976). Rather, the collective knowledge of all involved officers, not just the officers effectuating the arrest, is considered when determining whether probable cause for a warrantless arrest exists. Id. When evaluating an arrest's constitutional validity, the court must determine whether facts available to the officers at the moment of arrest would warrant a man of reasonable caution to believe that an offense has been committed. Beck, 379 U.S. at 96; McNeal, 955 F.2d at 1075. Additionally, the reviewing court must take into account factual and practical considerations of everyday life and whether they would lead a reasonable person to determine that there is a reasonable probability that illegality occurred or will occur soon. United States v. Strickland, 144 F.3d 412, 415 (6th Cir. 1998) (citing Illinois v. Gates, 462 U.S. 213, 231 (1983)). The rule is practical and nontechnical, affording the best compromise between the often opposing interests of law enforcement and a citizen's constitutional rights. Beck, 379 U.S. at 91.

The record shows that Samuel Skinner was arrested immediately after he was woken from sleeping in the truck. After unlocking the truck, he was immediately pulled from the truck,

handcuffed, and placed on the ground.  This was no Terry stop;[28] indeed, as the officers admitted, it was an arrest.  Therefore, to determine whether probable cause existed to make an admittedly warrantless arrest, the Court must review what the officers collectively knew at the moment of the arrest.

The Court finds that the officers knew the following facts before the arrest:

• A father, "Big Foot," and son were driving in tandem, with one in a pick-up truck and the other in a RV;

• Big Foot had acted as a courier for drugs and marijuana on several previous occasions;

• Big Foot was to begin loading a vehicle with marijuana on July 11, 2006 in Tucson, Arizona.  He was to begin traveling across the country, towards the southeast, on July 15, 2006;

• Approximately 1000 pounds of marijuana was loaded into the RV;

• Due to the large load of marijuana, it was highly likely that more than one person assisted in loading the RV;

• Big Foot used the same pick up truck each time he functioned as a courier;

• A pick up truck had ferried drugs from Tucson stash houses to the RV;

• The truck was nice, a Ford F250, dark in color, with Georgia tags;

• The RV was nice and had a diesel engine;

• The RV had southern state tags, probably from Alabama or Georgia;

• The vehicles were traveling from Tucson to Alabama or Georgia;

---

[28]Moreover, the government never argued that this was a Terry stop as opposed to a warrantless arrest.

• The phone was traveling on I-40 eastbound, and became stationary at the truck stop at about 2 A.M.;

• The couriers were supposed to take a rest after driving "another couple of hours" after 10:30 PM;

• A phone, already linked to drug trafficking via wire intercepts, was at the truck stop;

• At the truck stop, there was a pick up truck and an RV in close proximity to one another. Both the vehicles were running. Both had Georgia tags; and

• The other RVs in the truck stop parking lot did not match the target vehicles' descriptions based on their occupants or their license plates.

Based on these facts, a trained law enforcement officer would deduce, with probable cause, that the truck's occupant had either recently committed a crime or was presently committing a crime. See United States v. Cortez, 449 U.S. 411, 419 (1981) (holding that trained law enforcement officers may deduce from objective facts, that would be meaningless to an untrained individual, a legitimate basis for suspicion of a particular person). These deductions, combined with the facts known by the officers are sufficient to establish probable cause to arrest. See United States v. Padro, 52 F.3d 120, 123 (6th Cir. 1995) (holding that probable cause existed where an informant provided detailed information about the predicted travel route, vehicle, companion, and approximate time of arrival; the officers verified the vehicle's description, location, direction, and number of occupants; the vehicle was registered under a fictitious name; and an officer had personally observed another suspected drug dealer selling drugs from the same vehicle). Accordingly, the Court finds that officers had probable cause to arrest Samuel Skinner on the morning of July 16, 2007.

## III. CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing and the relevant legal authorities, there is no basis to suppress any of the evidence seized in this case or to suppress the statements made by either Defendant. For the reasons set forth herein, it is **RECOMMENDED** that Defendant Melvin Skinner's Motion to Suppress [Doc. 34] be **DENIED** and Defendant Samuel Skinner's Motion to Suppress Statements [Doc. 48] also be **DENIED**.[29]

Respectfully submitted,

_____s/ H. Bruce Guyton_____
United States Magistrate Judge

---

[29]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).